**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

**Civil Action No. 23-CV- 01789**

MOHAMED RAGAB

Plaintiff,

v.

ISPACE, INC., a Japanese Corporation, ISPACE TECHNOLOGIES U.S., INC., a Delaware
  Corporation, TAKESHI HAKAMADA, a Japanese Citizen, JUMPEI NOZAKI, a Japanese
  Citizen and RYO UJIIE, a Japanese Citizen.

Defendants.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW the Plaintiff, Mohamed Ragab, by and through his attorneys, Ragab Law Firm P.C.

and for his Complaint against Defendants Ispace, Inc. and Ispace Technologies U.S. Inc., Takeshi

Hakamada, Jumpei Nozaki, and Ryo Ujiie alleges and avers as follows:

### I.      PARTIES

1.   Plaintiff Mohamed Ragab ("Ragab") is an individual residing at 5836 S. Florence St,
     Greenwood Village, Colorado.

2.   Defendant ispace, inc. ("ispace") is a Japanese common stock corporation with its
     headquarters at Sumitomo Fudosan Hamacho Building 3F, 3-42-3, Nihonbashi Hamacho,
     Chuo-ku, Tokyo, Japan 103-0007.

3.     Defendant ispace Technologies U.S., inc. ("ispace US"), is a Delaware Corporation.

4.     Defendant Takeshi Hakamada (Hakamada) is the Founder, CEO and Representative Director of ispace, inc., and CEO of Ispace Technologies U. S., inc.

5.     Defendant Jumpei Nozaki (Nozaki) is Director and CFO of ispace, inc.

6.     Defendant Ryo Ujiie (Ujiie) is CTO of ispace, inc.

## II.     JURISDICTION AND VENUE

7.     Plaintiff incorporates by reference all paragraphs in this Complaint as though set forth separately herein.

8.     The Court has jurisdiction over the parties and claims based on diversity of citizenship.

Venue is proper in this court because acts and omissions forming the basis of Plaintiff's claims occurred in whole or in part in the District of Colorado.

## III.     FACTUAL ALLEGATIONS

**A.     <u>Defendant Ispace US, Based In Delaware, Was The Headquarters Of The Corporation When Plaintiff Was Hired And Granted Stock Options Representing 2.5% Of The Company.</u>**

9.     Plaintiff signed an employment contract with Defendant ispace on July 26, 2016.

10.   At the time of signing, Defendant ispace US, based in Delaware, was the headquarters of the corporation and was the managing company of Team HAKUTO, one of the 5 finalists in the Google Lunar XPRIZE Competition. The competition, which was organized by the XPRIZE Foundation, called for privately funded teams to be the first to land a robotic spacecraft on the Moon, travel 500 meters, and transmit back to Earth high-definition video and images.

11. Defendant ispace had entered into more than one contractual agreement with companies offering rides to the moon in order to compete in the Google Lunar XPRIZE Competition. These companies failed to fulfill their contractual obligations, leading ispace to commit to the development of its own lunar lander.

12. Plaintiff has a doctorate in Aerospace engineering and has decades of experience with major U.S. Aerospace companies.

13. In November 2015, Plaintiff attended the Third International Future Mining Conference in Sydney, Australia on behalf of his employer, United Launch Alliance (hereinafter "ULA"). At the conference, Plaintiff met Mr. Kyle Acierno (hereinafter "Mr. Acierno"), an employee of ispace, at their office in the NASA Ames Research Park in Moffett Field, California.

14. Following that conference, Defendant ispace was interested in getting a Memorandum of Understanding signed with ULA. Defendant Hakamada and Mr. Acierno visited ULA's headquarters in Centennial, Colorado in April 2016.

15. Plaintiff met Mr. Acierno again in June 2016 at the Space Resources Roundtable at the School of Mines in Golden, Colorado. At this event, Mr. Acierno explained that Defendant ispace was looking to start the development of its own lunar lander and was looking for an individual who could start and manage that program.

16. Plaintiff interviewed for that position and on July 26, 2016, and signed a formal employment contract, for a one-year term automatically renewable for 2 more years as long as the company remains solvent.

17. The employment contract included a grant of stock options to Plaintiff representing 2.5% of the company at signing.

18. Before signing the contract, Plaintiff insisted that his stock options would be vested in one year. Defendant Hakamada understood and agreed to that condition.

19. When Plaintiff started working for Defendant ispace, there were approximately ten employees. Plaintiff's new job as the Lander Program Manager/Chief Engineer required him to recruit virtually all of the lander development staff. Ultimately, Plaintiff recruited worldwide and hired more than twenty engineers for the program to become successful.

20. During this time, Defendant ispace reallocated its headquarters to Japan to help secure financing. It took over a year for Defendant ispace to put together series A financing. Plaintiff's credentials and the team he put together were significant assets used to secure investors and funding.

**B.   Defendant Ispace Did Not Issue Plaintiff's Stock Options In A Timely Manner.**

21. Defendant ispace did not issue Plaintiff's stock options in a timely manner as promised by the Defendants. This ultimately impacted the price to pay for each option.

22. Issuing the stock options took longer than a year, much longer than promised, and had an impact on the price to pay for each option.

23. At the time financing was being negotiated, there were 1 million shares of company stock with Plaintiff having been promised 25,000 stock options.

24. Prior to the first issue of stock options, Defendant Hakamada asked Plaintiff to reduce the number of his stock options to 15,000 instead of 25,000 and to delay issuing part of those stock options until after series A financing was secured.

25. Defendant Hakamada indicated that the price per share would not change much, if at all. Plaintiff did not agree to reduce his number of stock options, but he did agree to delay half of

his 25,000 stock options to follow series A financing so that additional employees could get stock options on the first issue.

26. On October 23, 2017, the first issue of stock options occurred (nearly fifteen months after Plaintiff's employment agreement was executed). The industry norm is that the stock options would be issued within several months and that the valuation would represent the value of the company at that time.

27. During the first issuance, the exercise price was 1,000 JPY per share, corresponding to a much larger value of the company than when Plaintiff was initially hired and when the stock options should have been issued.

28. Plaintiff's first issue of stock options specified that the balance of his 25,000 stock options would be part of the second issue of stock options.

29. The stock option agreement was made up of common language that Defendant ispace insisted would apply to everyone. Plaintiff was not allowed to get the changes he requested incorporated in the initial agreement.

C. **Defendants Had A Fiduciary Duty To Ensure That Plaintiff Could Exercise His Stock Options.**

30. When the stock option agreement was being put in place, Plaintiff had already vested all of his stock options. Due to this, he was able to get a statement included within the Agreement which overrode any language in the stock option agreement.

31. This statement contained terms and guarantees that in the event of his death, termination of employment, or inability to exercise his stock options for any reason, Plaintiff or his inheritors can still exercise his stock options. Additionally, in the event that Plaintiff is not able to enjoy the full benefits having been granted to him for any reason, Defendant ispace shall discuss in

good faith and take all reasonable actions for Plaintiff or his inheritors to enjoy such full benefits.

32. The intent of the above statement established a fiduciary duty obligating Defendant ispace to ensure that Plaintiff would be able to exercise his stock options under any circumstance.

33. On December 11, 2017, Series A financing was announced at a record $90.2 million US dollars. It was led by the Innovation Network Corporation of Japan and backed by a dozen Japanese companies including the Development Bank of Japan, Suzuki motors and Japan Airlines. It was later increased to nearly $95 million US dollars.

34. Plaintiff expected the second issue of stock options to take place shortly after the Series A financing was announced based on prior representations from Defendant Hakamada. Plaintiff routinely inquired about it.

35. On December 21, 2017, Defendant Hakamada indicated that the delay in stock option issue was the company's responsibility and that the legal process for the stock options has been completed in November.

36. On January 21, 2018, Plaintiff again inquired about his stock options. Defendant Hakamada indicated that the second stock option issue would occur by the end of March and that the U.S. valuation result was also on track to be completed by early March.

37. On April 3, 2018, Plaintiff inquired again about his stock options. On April 6, 2018, Plaintiff reminded Defendant Hakamada of his prior inquiries about the stock options and Defendant Hakamada stated that Defendant ispace is still awaiting a response from a U.S. third party institution for a company valuation. Defendant Hakamada then noted that the new target date was early May.

38. During Plaintiff's discussions with Defendant Hakamada, and unbeknownst to Plaintiff, the second stock option issue had been completed. Plaintiff did not receive his remaining 12,500 stock options in the second issue as stipulated in the agreement for the first issue.

39. The third issue of stock options was dated May 30, 2018. The agreement's structure and language were far more complex and Defendant ispace insisted on applying it to everyone. Plaintiff had again attempted to negotiate terms and was not allowed to get the changes he requested. However, Plaintiff was successful in adding the statement described in paragraphs 30 and 31 above.

40. Defendant Hakamada told Plaintiff shortly before the third issue of stock options that he is not allowing any more changes and it was up to Plaintiff to either sign the agreement as is or not receive his stock options, contrary to the promises made previously.

41. The exercise price per share on the third issue of stock options is 2,440 JPY; more than double the 1,000 JPY exercise price per share of the first issue of stock options. That increase cost Plaintiff an additional 18 million JPY to exercise his shares (over $160,000.00 US dollars).

42. In October of 2017, Plaintiff had contacted Draper Laboratory (hereinafter "Draper") and succeeded in getting Draper under contract to develop the landing algorithm and software for the ispace lunar lander. Draper is a prominent U.S. company that was behind the historic Apollo moon landings and is the worldwide leader in that field. That arrangement significantly reduced the risk of development and execution of the ispace lunar lander program.

**D.  The Draper Team Did Not Win Their Bid For A Nasa Moon Mission Due To Lack Of Schedule Credibility Due To The Actions Of The Defendants.**

43. In early 2018, NASA announced its Commercial Lunar Payload Services (CLPS) program and released a draft RFP on April 27, 2018. CLPS was open to U.S. commercial providers of

space transportation services. Defendant ispace, being a Japanese majority-owned entity, could not participate directly in that $2.6 billion series of indefinite delivery, indefinite quantity (IDIQ) contract opportunities to carry payloads to the moon for NASA over a 10-year period.

44.   As a result, Defendant ispace teamed up with Draper, General Atomics and Spaceflight Industries, to be selected to participate. The Draper led team was selected by NASA on November 29, 2018, to bid on the CLPS task orders.

45.   Following this success, Plaintiff and Defendant ispace signed a permanent employment contract on January 31, 2019. Plaintiff retained all his stock option rights that has been granted in his original employment agreement dated July 26, 2016.

46.   Draper, Defendant ispace, and General Atomics held a CLPS TO2 proposal kickoff meeting in San Diego, California on March 19, 2019. A proposal plan, task allocation and a Teaming Agreement document required to be submitted with the proposal were discussed during that meeting.

47.   Defendant Hakamada decided to manage the proposal for Defendant ispace. The final RFP came out on March 26, 2019, with the proposal deadline occurring thirty days later. The Draper team did not win their bid due to lack of schedule credibility. Defendant Hakamada had previously assured Plaintiff that the schedule was not part of Plaintiff's responsibility.

48.   On April 21, 2019, an anonymous email included a long series of Slack messages between several ispace employees, including Defendant Ujiie, slandering other ispace employees and plotting for their dismissal. ispace management did little to remedy the resulting toxic work environment and several employees voluntarily left or were forced to leave the company.

49. Defendant ispace was keen on getting any employees who left the company to forfeit their stock options. Additionally, Defendant ispace tried to get an agreement from every employee who had stock options that they will not exercise those options before an IPO. Specifically, Defendant Hakamada and Defendant Nozaki called Plaintiff to come to the office late at night in an attempt to convince Plaintiff to accept that agreement. Plaintiff refused to accept.

50. Defendant Hakamada asked Plaintiff to document the history of Defendant ispace's relationship with Draper. The resulting document addressed the CLPS opportunities which were an important part of that relationship. Defendant Hakamada reviewed and approved that document and its dissemination within ispace. The document was dated August 15, 2019.

### E.  Defendant Hakamada Attempted To Get Plaintiff To Forfeit His Stock Options.

51. Defendant Hakamada held several meetings with Plaintiff to discuss opportunities and potential assignments, including on September 18, 2019, and September 25, 2019.

52. During the September 18, 2019, meeting, Defendant Hakamada spent time discussing his feedback of Plaintiff's performance. Defendant Hakamada reminded Plaintiff that he is earning a lot of money and Plaintiff reminded Defendant Hakamada that it is according to his employment contract and that what Plaintiff has done for Defendant ispace "is tremendous" to which Defendant Hakamada replied "that is past".

53. During this meeting, Plaintiff and Defendant Hakamada discussed Defendant ispace's failure to secure the CLPS NASA contract with Draper. Defendant Hakamada asked Plaintiff to resign. Defendant Hakamada acknowledged that there is a binding indefinite employment contract and said that he was just "asking" if Plaintiff would resign willingly.

54. During the September 18, 2019, meeting, Plaintiff reminded Defendant Hakamada that when Defendant Nozaki suggested that Plaintiff move temporarily from managing the lander team, Defendant Nozaki stated that it would result in Plaintiff losing his stock options. However, these options had already been vested.

55. On September 20, 2019, Plaintiff sent an email to Defendant Nozaki asking for the countersigned copies of the third stock option agreement and asking who at ispace has the stock option request form and can provide the bank information for the payments to exercise stock options. On September 24, 2019, Defendant Nozaki replied that no one is assigned yet, but for the time being contacts are Defendant Hakamada, Defendant Nozaki or Hozumi Kawanishi, the ispace legal manager. Despite Defendant Nozaki being one of those points of contact, he never provided the bank account information to Plaintiff. Plaintiff mentioned that to Defendant Hakamada during the September 25, 2019, meeting.

56. The September 25, 2019, meeting started with an attempt by Defendant Hakamada to convince Plaintiff that his stock options are worth nothing and to get him to forfeit his stock options. Defendant Hakamada engaged in blatant attempts to force Plaintiff out of the company and defraud Plaintiff of his vested shares.

57. During the September 25, 2019, meeting, Defendant Hakamada conveyed veiled threats to Plaintiff about either willingly agreeing to leave the company, or being forced to leave.

58. Defendant Hakamada told Plaintiff to remember that if he keeps that "attitude not to try to agree, and then try to keep staying" … "psychologically, it's not good for" Plaintiff.

59. Defendant Hakamada warned that if Plaintiff continues his employment with Defendant ispace that, "similar things (such) as the Slack will happen again, and then more, much worse next time", and that "next option will be more proactive actions in bad way".

60. On September 26, 2019, Hakamada sent a written terms of termination document to Plaintiff. The first item stated that "the company will acquire the stock options which you (the Plaintiff) own for free of charge".

61. Knowing that he could not dismiss Plaintiff legally, Defendant Hakamada devised an impossible task for Plaintiff to sell a ten-kilogram payload in less than three months to a new customer with a binding contract. Defendant Hakamada made requirements that Plaintiff had to succeed in this endeavor. Plaintiff refused to accept this impossible task, but did everything he could to make progress in that regard, including attending 2 conferences in Sydney, Australia, and San Francisco.

62. Plaintiff sent a letter to Defendant ispace on December 10, 2019, documenting that this impossible task is an effort to unjustly dismiss Plaintiff. The letter reiterated that Plaintiff does not accept any restriction on his ability to exercise his stock options and reiterated as well his request for the information required to be able to exercise the stock options.

63. On February 22, 2020, Plaintiff received a notice of termination via email. The termination was to be effective March 31, 2020. The notice referred to lack of achievement and to events and interactions with U.S. companies, namely the meeting in San Diego on March 19, 2019.

### F. Defendants Prevented Plaintiff From Exercising His Stock Options, Claimed He Could No Longer Exercise His Stock Options, And Failed To Take Any Action To Compensate Him.

64. On March 15, 2020, Plaintiff, having obtained the stock option exercise form through a third-party, sent a request to exercise 300 stock options and requested the bank account information to make the payment. The 300 shares would allow Plaintiff to attend ispace shareholder meetings.

65. On April 17, 2020, Defendant ispace responded alleging that Plaintiff was dismissed for gross negligence and therefore cannot exercise any of his stock options. The response also noted Defendant ispace's refusal to provide the bank account information.

66. On June 4, 2020, Plaintiff sent a letter to Defendant ispace putting them on notice that he intends to exercise all his stock options and needs the bank account information to do so. The letter noted that they will be held responsible if they prevent him from exercising all his stock options by refusing to provide the bank account information.

67. Defendant ispace, nor any other Defendants, responded to the request.

68. On June 21, 2022, Defendant ispace, as a member of the Draper team was awarded a $73 million dollar NASA contract for a moon mission. Defendant Hakamada then replaced Mr. Acierno, becoming the CEO not only of Defendant ispace, inc. and Defendant ispace technologies US. Following this success, Plaintiff received acknowledgement and appreciation messages from Mr. Acierno and from Alan Campbell, the Draper program manager, for the role he played in putting that partnership together and winning that task order.

69. On January 10, 2023, Defendants informed Plaintiff that he cannot exercise his stock options because one year had passed since the date of his dismissal without Plaintiff exercising his stock options.

**G. Defendant Ispace Is Listed On The Tokyo Stock Exchange.**

70. On March 8, 2023, Defendant ispace announced that it will be listed on the Tokyo Stock Exchange beginning April 12, 2023. Following its IPO, Defendant ispace's shares reached a high of 2,373 JPY per share. Because Defendant ispace had a stock split of 1:20, Plaintiff's

original 25,000 stock options became 500,000 stock options valued at 1.19 billion JPY, or over $8 million US dollars.

71.   On April 25, 2023, the M1 lander failed to achieve a soft landing on the lunar surface which would have been the first ever successful moon landing by a private company.

72.   The M1 landing failure was traced back to ispace project management failing to order new landing simulations after changing the landing site.

73.   The M1 lander failure caused a sharp drop in the value of ispace shares, instead of an expected increase in value.

74.    Plaintiff relied on the plain language in his stock option agreements which ensured that he would be able to exercise his stock options, however, Defendant ispace maintained that since more than one year has passed following the dismissal, Plaintiff can no longer exercise his stock options.

75.   To date, Defendants have never provided the requisite bank account information for Plaintiff to exercise his stock options.

76.   Defendants did everything in their power to prevent and restrict Plaintiff from exercising his stock options and receiving his shares.

## I.       CLAIMS FOR RELIEF

### First Claim for Relief (Breach of Contract)

77.   Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

78.   Plaintiff entered into valid and enforceable employment contracts and stock option contracts (hereinafter collectively referred to as "Agreements") with Defendant ispace.

79.   The employment contract granted 2.5% of the company value to Plaintiff, as Vice President, at signing. Plaintiff's stock options were fully vested in one year, i.e., on July 26, 2017.

80.   Plaintiff and Defendant ispace Inc, with its wholly owned subsidiary ispace US, then entered into a stock option agreement for Plaintiff's first issue of stock options. Plaintiff's first issue of stock options was for 12,500 stock options and the agreement specified that the balance of Defendant's 25,000 stock options will be part of the second issue of stock options. Plaintiff then entered into a third stock option agreement which has yet to be fulfilled by Defendants.

81.   Plaintiff fully and/or substantially performed his obligations under these agreements with Defendants as described in the general allegations section above.

82.   Defendants have breached, and continue to breach, their obligations under their agreements with Plaintiff. Defendant's breaches include, without limitation, the failure to allow Plaintiff to exercise his vested stock options and the failure to follow-through on the terms put in place of both stock option contract one and three.

83.   The delay in the issue of stock options affects the ability of Plaintiff to exercise them in a timely manner and receive the tax benefits of employee stock options.

84.   As a proximate result of the foregoing breaches, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial. In addition to recovery of such damages, Plaintiff seeks all other equitable relief to which Plaintiff may be entitled.

### Second Claim for Relief (Promissory Estoppel)

85.   Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

86. Defendants made promises to Plaintiff that granted him stock options, vested in one year, with a value of approximately $18 million dollars. These promises induced Plaintiff to enter into employment with Defendants.

87. Defendants further promised that Plaintiff would be able to exercise his stock options at varying points of time as detailed above.

88. Defendants should have reasonably expected that their promises would induce action by the Plaintiff.

89. Plaintiff relied on Defendants' promises to his detriment.

90. As a result of Defendants' promises and Plaintiff's reasonable reliance on them to his detriment, they are estopped to deny the existence of their agreements with Plaintiff to grant him stock options and therefore upon exercise equity ownership interests in the Company.

91. Plaintiff has suffered damages in an amount to be proven at trial.

92. Defendants' promises must be enforced to prevent injustice.


### Third Claim for Relief (Covenant of Good Faith and Fair Dealing)

93. Plaintiff incorporates by reference all allegations and Paragraphs in this Complaint as if fully set forth herein.

94. Plaintiff and Defendants entered into valid and enforceable contracts including the employment agreements and the stock option agreements. Defendants owe Plaintiff a contractual duty of good faith and fair dealing in discharging his contractual obligations under the parties' contract.

95. Plaintiff fully or substantially performed his obligations under the contract with Defendants as further described in paragraphs above.

96. Defendants have breached and continue to breach their contractual duties of good faith and fair dealing. Defendants' breaches include extinguishing the Plaintiff's right to receive the benefits of the Agreements and their promises, refusing to honor promises to issue stock options and/or allow the exercise of stock options, and failure to protect Plaintiff's resulting equity ownership.

97. As a proximate result of the foregoing breaches, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial. In addition to recovery of such damages, Plaintiff seeks all other equitable relief to which Plaintiff may be entitled.

## Fourth Claim for Relief (Civil Theft and Conversion)

98. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

99. Civil theft is a statutory remedy allowing the owner of property taken by theft to maintain an action against the taker of the property.

100. Plaintiff had an agreement allowing him to exercise all his 25,000 stock options that were already vested.

101. Plaintiff, without authorization and by deception, was denied the ability to exercise his stock options by falsely claiming that he was dismissed for gross negligence, by failing to provide the requisite bank account information, by delaying his ability to exercise the options through multiple agreements at different periods of time during Plaintiff's employment, and by misrepresenting to Plaintiff that the stock options were valueless.

102. Plaintiff tried to exercise some of his options, and would have exercised all of his options within the allowable period. Plaintiff would then have been able to sell the resulting ispace

stocks following the IPO. At that time, Plaintiff would be entitled to 500,000 shares, valued at approximately $8,000,000.00.

103. Defendants knowingly obtained or exercised control over the stock options and resulting equity ownership interests and stock sale proceeds of Plaintiffs for past work that had already been performed. Specifically, Defendants withheld stock options, resulting in ownership equity and monies owed to Plaintiffs in accordance with the fulfilled agreements and promises.

104. Defendants did so with specific intent to permanently deprive Plaintiff of the use or benefit of ownership equity and monies rightfully due to him. Defendants' intent is evidenced by their systematic deceit over the course of years, despite repeated requests from Plaintiff to fulfil their commitments to the Plaintiff. Defendants either converted the 500,000 shares for themselves or provided them to other employees or investors.

105. Ultimately, the Defendants behavior constitutes theft. Defendants retained the ownership interest without authorization and through deceit, then cashed out the Plaintiff's stock option rights and resulting right to shares and monies by allocating those stock options to others or converting Plaintiff's ownership interests into company shares or monies resulting in permanent deprivation.

106. Defendants' theft damaged Plaintiff in an amount to be proven at trial. Pursuant to C.R.S. 18-4-405, Plaintiff is entitled to recover from Defendants, and hereby demands, three times the amount of his actual damages for theft as well as the costs and reasonable attorney's fees associated with this action.


**Fifth Claim for Relief (Fraud and Fraudulent Inducement)**

107. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

108. Defendant Hakamada, acting for himself individually and as Representative Director and CEO of Defendant ispace and Defendant ispace US, made false and misleading representations to Plaintiff from 2017 to the present time, including, that Defendants had granted Plaintiff 25,000 stock options per Plaintiff's first issue of stock options, that all 25,000 stock options were fully vested, and that Plaintiff would be able to exercise them no matter what, including in case of termination.

109. The first stock option agreement which granted 12,5000 stock options specified that the remaining balance of 25,000 stock options would be issued as part of the 2nd issue of stock options. Defendant Hakamada, acting for himself individually and as Representative Director and CEO of Defendant ispace and Defendant ispace US, did not honor that agreement and did not inform Plaintiff that he will not get his remaining stock options in the 2nd issue of stock options until after the 2nd issuance occurred.

110. Defendants included in the first issuance of stock options agreement the statement that the remaining balance of 25,000 shares will be issued to Plaintiff as part of the 2nd issuance of stock options. On the date of Plaintiff's termination (May 31, 2020), more than 2 years had passed since the board resolution agreement that Plaintiff would receive all 25,000 stock options. Defendants fraudulently conveyed to Plaintiff that the second half of Plaintiff's stock options were not exercisable on the day of his termination and therefore are no longer exercisable.

111. All of the fraudulent representations made to Plaintiff were made in an effort to induce his reliance and to cause him to devote his time and energy to Defendant ispace. Additional

fraudulent representations were made in an effort to deprive Plaintiff of his stock options as further detailed in the general allegations section.

112. To complete their fraudulent scheme, Defendants, after preventing Plaintiff from exercising his stock options, claimed that Plaintiff could no longer exercise his stock options because one year has passed after his dismissal.

113. Defendants' fraud has resulted in damages to Plaintiff in an amount to be proven at trial.

## Sixth Claim for Relief (Civil Conspiracy)

114. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

115. Defendants, two or more, formed an agreement between them, by words or conduct, to defraud Plaintiff out of his earned stock options and resulting equity and monies by using a series of illegal actions. These actions include, but are not limited to, Defendant Nozaki and Defendant Hakamada attempting to take away Plaintiff's right to exercise his stock option at the time of his own choosing, refusing to provide the stock option request form, and refusing to provide the bank account information necessary for Plaintiff to pay for the stock options.

116. Defendant Ujiie along with others supported the unlawful dismissal of Plaintiff with false allegations as an integral part of the scheme to defraud Plaintiff out of his stock options and resulting equity ownership interest in the company.

117. In furtherance of this conspiracy to commit fraud, civil theft, and the remaining claims herein against Plaintiff, Defendants actively concealed their nefarious scheme to mislead and misrepresent their true intentions to deny Plaintiff his ownership interests in the Company, and instead, to keep those valuable rights and monies for themselves.

118. Plaintiff sustained damages caused by Defendants' conspiracy to defraud Plaintiff by dishonest means.

**Seventh Claim for Relief (Unjust Enrichment)**

119. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

120. Plaintiff and Defendants had express and implied Agreements and promises regarding Plaintiff's granted stock options and resulting equity ownership interests in Defendant ispace.

121. Plaintiff provided services to Defendants consistent with the Agreements and operated in good faith.

122. Defendants received and retained the benefit of Plaintiff's investment of time, energy and services, and divested equity and monies owed to the Plaintiff for the benefit of Defendants.

123. Defendants were contractually obligated to compensate Plaintiff in accordance with the terms of the various Agreements between the parties. Instead, Plaintiff was denied access to vested stock options and his equity ownership interest that rightfully belonged to him.

124. Justice, fairness, and equality would be offended if Defendants were not required to compensate Plaintiff for the investment and services he completed.

125. Plaintiff should be awarded damages commensurate with the converted funds/stock options benefitting the Defendants.

**Eighth Claim for Relief (Quantum Meruit)**

126. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

127. Plaintiff completed services on behalf of, and for the benefit of, the Defendants. Defendants were required to compensate him in accordance with the terms of the various Agreements.

128. Defendants received and retained the financial benefits of Plaintiff's services and contribution of equity by the failure to compensate Plaintiff in accordance with the terms of the various Agreements.

129. Defendants did not raise allegations or suggest to Plaintiff that he did not satisfy obligations that may have been a pre-requisite for the compensation to Plaintiff in accordance with the terms of the various Agreements.

130. Defendants failed to compensate Plaintiff in accordance with the terms of the various Agreements for the services provided.

131. Justice, fairness, and equality would be offended if the Defendants were permitted to retain the benefits, including equity and monies due to Plaintiff in accordance with the terms of the various Agreements.


**<u>Ninth Claim for Relief (Breach of Fiduciary Duty)</u>**

132. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

133. Plaintiff and Defendants entered into an agreement which stated that Plaintiff's or his inheritors would be able to exercise and enjoy the benefits of his 25,000 shares of ispace, which represented 2.5% of the total company value, under any and all circumstances, including Plaintiff's death and termination of employment. This created a fiduciary duty on ispace and its principals.

134. Defendants had a fiduciary duty to ensure that Plaintiff, or his inheritors, are able to exercise the benefits of his 25,000 shares of ispace under any and all circumstances. Defendants breached that fiduciary duty by refusing to allow Plaintiff to exercise his stock options and refusing to provide Plaintiff with the requested stock option exercise form and bank account information on multiple occasions.

135. Defendants held Plaintiff's stock options and resulting equity ownership interests in ispace, and subsequently may have allocated those stock options to others and/or converted those ownership units into shares of ispace.

136. Defendants acted as trustees of Plaintiff and owed him a fiduciary duty as a matter of law. Defendants breached their fiduciary duty to Plaintiff by keeping for themselves rights, equity, and monies that belonged to him.

137. Defendants are fiduciaries to Plaintiff, to the extent that they are holding equity ownership rights rightfully belonging to Plaintiff.

138. In equity, a breaching fiduciary may not retain any benefits obtained by his breach. Plaintiff seeks equitable disgorgement of all rights, properties, monies, and anything else of value retained by Defendants, one or more, and asks the Court to order an accounting and impose a constructive trust on all such rights, properties, monies, and other things of value, for Plaintiff's benefit.

139. As a result of their breaches, Defendants caused Plaintiff to suffer damages in an amount to be proven at trial.

### Tenth Claim for Relief (Mail and Wire Fraud)

140. Plaintiff incorporates by reference all factual allegations in this Complaint as if fully set forth herein.

141. Defendants used mail and/or wire to convey the offer for 2.5% of the shares of the Company and then later inform Plaintiff of his dismissal while Plaintiff was residing at his home in Greenwood Village, Colorado, on February 22, 2020.

142. On April 17, 2020, Defendants used mail and/or wire to inform Plaintiff, directly or through his attorney of their refusal to provide the bank account information needed for the Plaintiff to exercise his stock options.

143. On April 17, 2020, Defendants used mail and/or wire to inform Plaintiff, directly or through his attorney, of their false allegation that he was dismissed for gross negligence and therefore cannot exercise his stock options.

144. On January 10, 2023, Defendants used mail and/or wire to inform Plaintiff, directly or through his attorney of their false allegation that he cannot exercise his stock options because one year has passed since his dismissal without Plaintiff exercising his stock options.

145. Defendants represented to Plaintiff, in two separate agreements, that he will be able to exercise his 25,000 stock options even in the event of his termination of employment. These agreements also stated that in the event that he is not able to enjoy the full benefits having been granted to him for any reason, Defendants shall discuss in good faith with Plaintiff and take all reasonable actions for Plaintiff to enjoy his full benefits.

146. Through their use of mail and/or wire, Defendants denied Plaintiff the opportunity to exercise his stock options, avoided discussing in good faith with Plaintiff, and failed to take all reasonable actions for Plaintiff to enjoy the full benefits of his stock options and resulting equity ownership.

147. The use of mail and/or wire was therefore an integral part of Defendants' scheme to defraud Plaintiff, deny him his stock option rights and resulting benefits, and enrich themselves at Plaintiff's detriment.

148. These violations were committed knowingly, willfully, and with reckless disregard of applicable law as Defendants knew they were denying Plaintiff his stock option rights and resulting equity and benefits.

149. As a result, Plaintiff has been damaged in an amount to be determined at trial. Plaintiff hereby demands the restitution of his stock option rights, resulting equity and/or monies in addition to any other remedies available.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant him the following relief:

(a)   Actual damages to the full extent allowed by law, including ispace shares or an amount equal to the value of the ownership equity to which Plaintiff is entitled, compensation for the increased tax burden, and compensatory damages;

(b)   Three times Plaintiff's actual damages based on Defendants' civil theft;

(c)   Exemplary damages for Defendants' fraudulent and egregious conduct;

(d)   Prejudgment and post judgment interest at the highest lawful rate;

(e)   Reasonable attorneys' fees, as well as costs as a result of this action;

(f)   Equitable relief in the form of constructive trust, quantum meruit, unjust enrichment, accounting, and disgorgement of all benefits received by Defendants by the breach of fiduciary duties owed to Plaintiff; and

(g)   Such other and further relief, in law or in equity, as this Court deems just and proper.

## JURY DEMAND

Plaintiff makes a timely demand for trial by jury on all issues so triable.


Respectfully submitted,

/s/ Kaylea Waechter
Kaylea Waechter, #49961
Sami M. Ragab, #49537
sami@ragablawfirm.com
kaylea@ragablawfirm.com
RAGAB LAW FIRM, P.C.
700 17th St, Suite 650
Denver, CO 80202
(303) 564-7313
COUNSEL FOR PLAINTIFF