**ISPACE, INC. (THE "*COMPANY*")**
**STOCK OPTION AGREEMENT**

Unless otherwise defined herein, the terms defined in the Terms and Conditions for Stock Options of the 3rd Issue of Stock Option (the "***Plan***"), attached as **Exhibit A**, and the Sub-Plan to the Terms and Conditions for Stock Options of the 3rd Issue of Stock Option (the "***Sub-Plan***" and, together with the Plan, the "***Plan Documents***"), attached as **Exhibit B**, shall apply to such terms used in this Stock Option Agreement (this "***Stock Option Agreement***"). If there is a conflict, whether explicit or implied, between the definitions in the Plan and the definitions in the Sub-Plan, the Sub-Plan definitions shall prevail.

## I. NOTICE OF STOCK OPTION GRANT

**Name:** Mohamed Ragab

**Address:** Roppongi 5-18-17-1102, Minato-ku, Tokyo 106-0032

The undersigned individual ("***Participant***") has been granted the number of options as set forth below upon exercise of each of which Participant is entitled to purchase the number of Shares as set forth below, subject to the terms and conditions of the Plan Documents and this Stock Option Agreement, as follows (each an "***Option***" and collectively, the "***Options***"):

| | |
|---|---|
| Date of Grant: | 30 May, 2018 |
| Exercise Price per Share: | 2,440 JPY |
| Total Number of Options Granted: | 12,500 |
| Number of Shares subject to each Option Granted: | 1 Share |
| Total Number of Shares Granted: | 12,500 |
| Total Exercise Price: | 30,500,000 JPY |
| Type of Option for U.S. Tax Purposes: | ✓ ISO |
| | __ NSO |
| Type of Option for Japan Tax Purposes: | ✓ JP Qualified Stock Option |
| | __ JP Non-Qualified Stock Option |
| Exercise Term/Expiration Date: | 10 years from the Date of Grant |
| Bank Account: | Mizuho Bank, Ltd. or its successor at the applicable time. |

Participant shall pay no consideration for the Grant of the Option.

MR

Ex. 5

Termination Period:

Unless the Board determines otherwise, subject to the other conditions set forth in this Stock Option Agreement and the Plan Documents, the Options shall be exercisable for one (1) year after Participant ceases to be a Service Provider, unless such termination is due to Participant's death, termination of employment or inability to exercise the Options for any other reason before his or her actually exercising the Options, in which case the Participant or the inheritor(s) of the Participant may exercise the Options in accordance with the Plan Documents (provided that in no event shall the Options terminate prior to the date specified by applicable law (including but not limited to Section 25102(o) of the California Corporations Code, if applicable)). In the event that the Participant or his inheritor(s) are not able to enjoy the full benefits having been granted to the Participant for any reason, the Company shall discuss in good faith with the Participant or the inheritor(s) and take all reasonable actions for the Participant or the inheritor(s) to enjoy such full benefits to the extent permitted by applicable laws. Notwithstanding the foregoing, if Participant's termination of Status is for Cause, the Options will expire immediately.

"Cause" means (i) Participant's breach, with the intent to forfeit its Shares, of any provision of this Stock Option Agreement, the Plan Documents, any applicable laws and regulations related to Participant's performance of duties for the Company, or the Company's internal rules; or (ii) Participant's entering into an agreement to become, whether paid or unpaid, a director, officer, employee, representative, contractor, counsel, or consultant of a company, other than a government space agency or an Affiliate of the Company, that is a Competitor of the Company or its Affiliates, unless the Participant obtains prior written permission from the Company.

"Competitor" means any company that engages in any of the activities engaged by the Company, as determined by the Company in its sole discretion.

"Affiliate" means a subsidiary stipulated in the Ordinance on Terminology, Forms, and Preparation Methods of Financial Statements, etc. of Japan or a related company stipulated in the same ordinance .

## II. AGREEMENT

1. Grant of Option.

(a) The Company hereby grants to Participant the Options to purchase the number of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "***Exercise Price***"), and subject to the terms and conditions of the Plan Documents, which are incorporated herein by reference. Subject to Section 9 of the Sub-Plan, in the event of a conflict between the terms and conditions of the Plan Documents and this Stock Option Agreement, the terms and conditions of the Plan Documents shall prevail.

(b) If designated in the Notice of Stock Option Grant as an ISO, each of the Options is intended to qualify as an ISO as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), each of the Options shall be treated in the U.S. as an NSO. Further, if for any reason any of the Options shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as an NSO in the U.S. granted under the Plan Documents. In no event shall the Board, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of any of the Options to qualify for any reason as an ISO in the U.S.

(c) If designated in the Notice of Stock Option Grant as a JP Qualified Stock Option, as defined below, each of the Options is intended to qualify as a Specified Stock Option (*tokutei-shinkabu-*



MR

*yoyakuken-tou*) (the "***JP Qualified Stock Option***") as defined in Clause 1 of Article 29-2 of the Special Taxation Measures Law in Japan (*sozei-tokubetsu-sochi-hou*) (the "***STML***"). Nevertheless, to the extent that it exceeds the JPY12,000,000 rule provided in the proviso of Clause 1 of Article 29-2 of STML, the Options shall be treated in Japan as a stock option to which the special treatment for taxation under Article 29-2 of the STML (the "***Special Treatment***") may not apply (the "***JP Non-Qualified Stock Option***"). Further, if for any reason any of the Options shall not qualify as a JP Qualified Stock Option, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a JP Non-Qualified Stock Option in Japan granted under the Plan Documents. In no event shall the Board, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of any of the Options to qualify for any reason as a JP Qualified Stock Option in Japan.

(d) The Company and Participant hereby acknowledge and agree that the Options have been granted to Participant in compliance with the Article 244(1) of the Companies Act.

(e) Provision regarding Item 3 of Clause 1 of Article 29-2 of the STML. Subject to Section 9(c) of this Stock Option Agreement, the Company and Participant hereby acknowledge and agree that the Exercise Price per share in the Notice of Stock Option Grant is equal to at least fair market value of the Company at the time of the execution of the Date of Grant.

2. Exercise of Option.

(a) Right to Exercise. The Options shall be exercisable during the Exercise Term in the Notice of Stock Option Grant in accordance with the applicable provisions of the Plan Documents and this Stock Option Agreement.

(b) Provision regarding Item 1 of Clause 1 of Article 29-2 of the STML. Notwithstanding Section 2(a), Participant shall only be allowed to exercise the Options during the period, starting two years from the Date of Grant, and ending 10 years from the Date of Grant.

(c) Provision regarding Item 2 of Clause 1 of Article 29-2 of the STML. Participant may only exercise the Options up to an aggregate Exercise Price of 12,000,000 yen (provided that if the amount specified in Article 29-2, Paragraph 1, Item 2 of the STML is amended, the maximum amount above shall be changed to the amended amount thereof upon the implementation date of the amended STML, which includes the amendment thereof; hereinafter the same in this Section 2(c)) in any given calendar year (January 1 to December 31). In addition, to the extent Participant has exercised the Options and/or other Specified Stock Options (*tokutei-shinkabu-yoyakuken-tou*) (as defined in Clause 1 of Article 29-2 of the STML) granted by the Company or other corporations in any given calendar year, Participant may only exercise the Options and/or other Specified Stock Options such that the aggregate exercise price of all such exercises does not exceed 12,000,000 yen in such calendar year. Participant hereby acknowledges and agrees that the Special Treatment under the STML may not be applicable to the exercise of the Options and other Specified Stock Options to the extent that the aggregate exercise price of all exercised options in any given calendar year exceeds 12,000,000 yen.

(d) Method of Exercise. The Options shall be exercisable by delivery of an exercise notice in a form and pursuant to such procedures as the Board may determine (the "***Exercise Notice***"), which shall state the election to exercise the number of Options being exercised. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Options being exercised, together with any applicable tax withholding. The Options shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding. Shares issued upon exercise of the Options will be issued in the name of



MR

Participant. Until the Shares are issued and registered in the shareholder registry of the Company, no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to the Options, notwithstanding the exercise of the Options. The Company will issue (or cause to be issued) such Shares and register the Participant as a holder of such Shares in the shareholder registry of the Company promptly after the Options are exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 7 of the Sub-Plan.

Shares will not be issued pursuant to the exercise of the Options unless the exercise of the Options and the issuance and delivery of such Shares will comply with applicable laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Options are exercised with respect to such Shares.

The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

(e) Provision regarding Item 5 of Clause 1 of Article 29-2 of the STML. The grant of the Options by resolution of the Board and the issuance of shares upon exercise of the Options shall be in compliance with Clause 1 of Article 238 of the Companies Act in Japan.

(f) Provision regarding Item 6 of Clause 1 of Article 29-2 of the STML. In accordance with an agreement between the Company and a financial service provider or financial institution (a "***Financial Services Provider***") regarding the shareholders of record, consignment for deposit, and entrustment for administration and disposition of the shares of the Company issued upon exercise of the Options, Participant shall, through the Company, immediately after acquiring the Shares issued upon exercise of the Options, specify or record his/her name as a holder of such Shares on the book-entry account of such Financial Services Provider, or consign for deposit such Shares or entrust such Shares for administration and disposition at the place of business or office of such Financial Services Provider. The Company will inform Participant of such Financial Services Provider.

(g) Book-Entry Shares. If the Shares with respect to which the Options are being exercised are "book-entry shares" (*furikae-kabushiki*) as defined in the Act on Book-Entry of Company Bonds, Shares, etc., Participant shall open a book-entry account under the name of Participant with the account management organization specified by the Company in advance of the exercise of the Options and shall notify the Company of such account.

(h) Execution of an Agreement. Upon the issuance of the shares of the Company by the exercise of the Options, the Participant shall enter into an agreement that includes the provisions set out in **Schedule 1** with a party or parties designated by the Company as of the date of payment of the aggregate Exercise Price as to all Options being exercised.

3. Execution of a Memorandum of Understanding. As may be requested by the Company before the initial public offering, Participant agrees to execute and deliver a certain "Memorandum of Understanding" in respect of continuing ownership of any new shares or otherwise in such a form as may be prescribed by any stock exchange or Japan Securities Dealers Association shall be entered into by and between Participant and the Company in connection with the Options and the Shares with respect to which the Options are being exercised. The Participant shall not exercise any of its Options without agreeing to such Memorandum of Understanding. In the event of any change to the rules and regulations relating to the Options promulgated by any stock exchange or Japan Securities Dealers Association, Participant shall be subject to the necessary procedures in accordance with the Company's instructions.



MR

4. Participant's Representations. In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), at the time any of the Options is exercised, Participant shall, if required by the Company, concurrently with the exercise of all or any of the Options, deliver to the Company his or her Investment Representation Statement in the form attached hereto as **Exhibit C**.

5. Method of Payment. Payment of the aggregate Exercise Price shall be paid by wire transfer to the bank account designated by the Company in the Notice of Stock Option Grant. Any fees, commissions, etc. incurred in the payment process shall be borne by the Participant. The Company may designate the detailed procedures and Participants shall follow them.

6. Restrictions on Exercise.

(a) The Options may not be exercised until such time as the Sub-Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any applicable law.

(b) Notwithstanding the provisions of this Stock Option Agreement and the Plan Documents, if any of the following events befalls the Participant, the Participant shall not exercise the Options after the timing stipulated below and Participant shall be deemed to have forfeited, as of such timing, all of the Options unexercised by then, provided that Participant shall have at least thirty (30) days following his or her termination of being a Service Provider to exercise Options if such termination is other than for Cause:

(i) In cases where the Participant breaches any provision of this Stock Option Agreement with the intent to forfeit his shares: At the time of occurrence of such breach; and

(ii) In cases where the Participant, without obtaining prior written approval by the Company, becomes, whether paid or unpaid, a director, officer, employee, representative, contractor, counsel, or consultant (the "Position") of a company, except for a government space agency or any of the Company's Affiliates, that is a Competitor of the Company or its Affiliates: At the time when the Participant assumes the Position.

(c) If exercise of the Options by the Participant or its assignee is prohibited by an applicable securities law filing obligation or another similar obligation is imposed on the Company upon such exercise due to the laws and regulations of the country or region where the Participant or its assignee resides, Participant shall be deemed to have forfeited, as of such timing, all of the Options unexercised by that time.

7. Non-Transferability of Option and Provision regarding Item 4 of Clause 1 of Article 29-2 of the STML.

(a) Other than any automatic transfer of the Options to Participant's inheritor(s) upon the Participant's death, the Options may not be transferred, pledged or disposed in any manner by Participant to any third party.

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Board determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "***Reliance End Date***"), Participant shall not transfer the Options or, prior to exercise, the Shares subject to the Options, in any manner other than (i) to persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or



MR

(ii) to an executor or guardian of Participant upon the death or disability of Participant. Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to the Options, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

(c) The terms of the Plan Documents and this Stock Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Participant.

8. Term of Option. The Options may be exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan Documents and the terms of this Stock Option Agreement.

9. Tax Obligations.

(a) Tax Withholding. Prior to the delivery of any Shares pursuant to the exercise of the Options, the Company will have the power and the right to deduct or withhold, or require Participant to remit to the Company, an amount sufficient to satisfy U.S. federal, state, local, foreign or other taxes (including Participant's FICA obligation) required to be withheld with respect to the exercise of the Options. Participant agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Participant) for the satisfaction of all U.S. federal, state, local, foreign or other tax withholding requirements applicable to the exercise of Options. Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

The Board, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit Participant to satisfy such tax withholding obligation, in whole or in part by (without limitation) paying cash. The amount of the withholding requirement will be deemed to include any amount which the Board agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum U.S. federal, state or local marginal income tax rates applicable to Participant with respect to the exercise of the Options on the date that the amount of tax to be withheld is to be determined. The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

(b) Notice of Disqualifying Disposition of ISO Shares. If each of the Options granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Participant shall immediately notify the Company in writing of such disposition. Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant.

(c) Code Section 409A. Under Code Section 409A, an option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per share exercise price that is determined by the Internal Revenue Service (the "***IRS***") to be less than the fair market value of an underlying share on the date of grant (a "***discount option***") may be considered "deferred compensation." An option that is a "discount option" may result in (i) income recognition by the optionee prior to the exercise of the option, (ii) an additional twenty percent (20%) federal income tax, and (iii) potential penalty and interest charges. The "discount option" may also result in additional state income, penalty and interest tax to the optionee. Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of the Options equals or exceeds the fair market value of a Share on the date of grant in a later examination.



MR

Participant agrees that if the IRS determines that any of the Option was granted with a per Share exercise price that was less than the fair market value of a Share on the date of grant, Participant shall be solely responsible for Participant's costs related to such a determination.

(d) In addition to what is provided for in each of the preceding items, Participant shall be responsible for and pay at its own expense any income tax and any other taxes and public dues imposed on Participant with respect to the grant and exercise of the Options and the disposition of shares of the Company acquired upon exercise of the Options.

10. Leaves of Absence/Transfer Between Locations. If Participant is an Employee, Participant will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, or any Subsidiary. If each of the Option is an ISO, no such leave may exceed three (3) months unless reemployment upon expiration of such leave is guaranteed by statute or contract, and if reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1st) day of such leave, each of the Options will cease to be treated as an ISO and will be treated for the U.S. tax purposes as an NSO.

11. Compliance with Applicable Laws and Regulations.

(a) The Company and the Participant hereby confirm that the Company provided notice regarding Article 242, Paragraph 1 of the Companies Act of Japan.

(b) The Company and the Participant hereby confirm that notice from the Company to the Participant under Article 243, Paragraph 3 of the Companies Act of Japan has been completed.

(c) In the sale of shares obtained upon exercise of the Options, the Participant shall comply with the Financial Instruments and Exchange Act of Japan, the Companies Act of Japan, taxation laws and all other applicable laws and regulations, as well as all internal rules of the Company.

12. Demand for Purchase of the Options. The Participant shall in no event exercise the right to demand purchase of the Options stipulated in Articles 118, 777, 787 and 808 of the Companies Act of Japan.

13. Amendment of this Stock Option Agreement.

(a) After the execution of this Stock Option Agreement, in case of revision or other change to the relevant laws and regulations such as the Companies Act and the Act on Book-Entry Transfer of Company Bonds, Shares of Japan, and the amendment of the Company's articles of incorporation, or other similar changes, and if the Company deems the amendment of this Stock Option Agreement as necessary, the Company may amend this Stock Option Agreement by providing notice of the details of such modification to the Participant; provided that, no amendment, alteration, suspension or termination of this Stock Option Agreement will materially impair the rights of Participant, unless the Participant and the Company otherwise agree in writing.

(b) Further to the preceding paragraph, if the Company implements a merger, corporate demerger or there is a reasonable ground, the Company, pursuant to the resolution of the Board, may amend this Agreement by providing notice of the details of such modification to the Participant; provided that, no amendment, alteration, suspension or termination of this Stock Option Agreement will materially impair the rights of Participant, unless the Participant and the Company otherwise agree in writing.

14. No Assignment. Neither party shall, directly or indirectly, assign, transfer or otherwise dispose of any of its rights or obligations hereunder without the prior written consent of the other party.



MR

15. Entire Agreement; Governing Law; Dispute Resolution. The Plan Documents are incorporated herein by reference. The Plan Documents and this Stock Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant. This Stock Option Agreement is governed by the laws of Japan. All disputes and litigation arising out of or related to this Stock Option Agreement will be subject to the exclusive jurisdiction of the Tokyo District Court.

Participant acknowledges receipt of a copy of the Plan Documents and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Options subject to all of the terms and provisions thereof. Participant has reviewed the Plan Documents and the Options in their entirety, has had an opportunity to obtain the advice of counsel prior to executing the Options and fully understands all provisions of the Options. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under the Plan Documents or the Options. Participant further agrees to notify the Company upon any change in the residence address indicated below.

PARTICIPANT

[signature]
Signature

Mohamed Ragab
Print Name

Roppongi 5-18-17-1102

Minato-ku, Tokyo 106-0032
Residence Address

ISPACE, INC.

By: [signature]

Takeshi Hakamada
Print Name

Chief Executive Officer
Title

3-1-6, Azabudai, Minato-ku, Tokyo

# EXHIBIT A

## THE PLAN

MR

Terms and Conditions for Stock Options

1. Number of Stock Options 27,500 units at most

2. Details of the Stock Options

The class and the number of shares which are covered by the stock options shall be one (1) share of the common stock of ispace, inc., a Japanese joint stock corporation (*kabushiki kaisha*) (the "Company").

On and after the allotment date of the stock options, where the Company conducts a share split (including allotment of shares without contribution (hereinafter the same)), or reverse-share split of common stock, the number of shares which are covered by the stock options shall be adjusted by the following formula and any fractions falling short of one (1) shares as a result of the adjustment shall be rounded down.

$$\text{Number of Shares after adjustment} = \text{Number of shares before adjustment} \times \text{Ratio of share split or reverse-share split}$$

The number of shares after the adjustment shall be applied on and after the date set forth in Paragraph 4, Item (2), Subparagraph (i).

In addition to the above, on and after the allotment date of the stock options, in case of any event which requires an adjustment of the number of shares covered, the adjustment shall be made, within a reasonable extent by the Company.

In the case of an adjustment of the number of shares covered, the Company shall notify the holder of each of the affected stock options recorded in the registry of stock options or give public notice by one (1) day prior to the date of the effectiveness of the number of shares after the adjustment. However, where the Company is unable to issue a notice or to give public notice by the aforementioned time, it shall issue a notice or give public notice promptly thereafter.

3. Amount to be Paid in Upon Exercise of Each Stock Option

The amount to be paid in each stock option upon the exercise thereof shall be the amount obtained by multiplying the amount to be paid in upon exercise of each stock option (the "Exercise Price") and the number of shares covered by each stock option.

The Exercise Price shall be JPY 2,440 and adjusted based upon the formula set forth in Paragraph 4.

4. Adjustment of the Exercise Price

(1) After the allotment date of the stock options, where the Company conducts the following, the Exercise Price shall be adjusted by the following formula (the "Exercise Price Adjustment Formula"), and any fractions falling short of one (1) yen as a result of the adjustment shall be rounded up.

(i) In case where the Company conducts a share split or reverse-share split:

$$\text{Exercise Price after adjustment} = \text{Exercise Price before adjustment} \times \frac{1}{\text{Ratio of share split or reverse-share split}}$$

MR

(ii) In case where the Company issues common stock, or disposes of the treasury shares of the common stock (excluding the disposal of the treasury shares set forth in Article 194 of the Companies Act of Japan), at a value that is less than the market price:

$$\text{Exercise Price after adjustment} = \text{Exercise Price before adjustment} \times \frac{\text{Number of issued shares} + \dfrac{\text{Number of new shares to be issued} \times \text{Amount to be paid-in per share}}{\text{Market price}}}{\text{Number of issued shares} + \text{Number of new shares to be issued}}$$

A) In the Exercise Price Adjustment Formula, the "Market price" shall be the price stipulated below:

(a) On and before the date on which the common stock of the Company is listed in one of the stock exchanges in Japan or other countries (the "IPO"):
Exercise Price before adjustment on a day before the date stipulated in Item (2), on which Exercise Price after adjustment is applied (the "Application Date");

(b) On and after the date of the IPO:
The average closing price of the common stock of the Company in the stock exchange where the common stock of the Company is listed (if the number of such stock exchanges is more than one, the most appropriate one will be chosen with regard to the performance of the share, cut rate, and any other circumstances) between 45 business days before the Application Date and 15 business days before the Application Date.

B) In the Exercise Price Adjustment Formula, "Number of issued shares" shall be the number of shares obtained by adding the number of common stocks that are subject of the issued and outstanding (except for the ones owned by the Company) potential shares ("potential shares" mean convertible shares, redeemable shares, stock options, convertible bonds or other equity securities that can be converted into common stocks of the Company upon the request of the holder or the Company or subject to certain conditions), to the number of issued common stocks on the record date, or, on the day one month prior to the Application Date if there is no record date.

C) In the case of a disposal of treasury shares, the "number of new shares to be issued" in the Exercise Price Adjustment Formula shall be read as the "number of treasury shares to be disposed."

(2) The Application Date shall be the day set forth below:

(i) In the case of the adjustment under Item (1) Subparagraph (i), and in case of share split, Exercise Price after adjustment shall be applied after the following day of the record date, or after the date where the share split becomes effective if there is no record date, and in case of reverse share split, Exercise Price after adjustment shall be applied after the date where the reverse share split becomes effective; *provided, however*, that it shall be retroactively applied from the following day of the record date where the share split shall be effective on the condition that a resolution by which the Company may increase its capital

MR

stock and capital reserves by decreasing its profit reserve is approved in the shareholders' meeting of the Company and the record date of such share split is set before the closing of the shareholders' meeting.
In the latter case, the number of the common stocks issued to the stock option holders who exercised the stock options in the period between the following day of the record date and the date where the shareholders' meeting is closed (the number of the shares to be issued in this case shall be the "Number of shares exercised before split" hereinafter), is adjusted by the formula below and any fractions falling short of one (1) yen incurred as a result of the adjustment shall be rounded down.



$$\text{Number of new shares to be issued} = \frac{(\text{Exercise Price before adjustment} - \text{Exercise Price after adjustment}) \times \text{Number of shares exercised before split}}{\text{Exercise Price after adjustment}}$$

(ii) In the case of the adjustment under Item (1) Subparagraph (ii), Exercise Price after adjustment shall be applied after the following day of the record date, or, if there is no record date, the following day of the due date of payment or the final day of the paying period with regard to the issuance or the disposal.

(3) Other than the cases set forth in Item (1), Subparagraph (i) and (ii), in the case of any events necessitating similar adjustments of the Exercise Price after the allotment date of the stock options, such as a merger where the Company is a surviving company or a corporate demerger where the Company becomes the successor company, the Exercise Price shall be appropriately adjusted within a reasonable extent by the Company.

(4) In the case of an adjustment of the Exercise Price, the Company shall notify the stock option holders or give them public notice of the required information up to one (1) day prior to the Application Date. However, where the Company is unable to issue a notice or to give public notice by the above time, it shall issue a notice or give public notice promptly thereafter.

5. Period in which the Stock Options may be Exercised

From the date 2 years passed after the resolution regarding the issuance of the Stock Options to the date 10 years pass after such resolution

6. Matters Concerning Stated Capital and Capital Reserves to be Increased Where Shares are Issued Through the Exercise of the Stock Options

(1) The amount of stated capital to be increased where shares are issued due to the exercise of the stock options shall be 1/2 of the maximum amount of the increase in the stated capital to be calculated pursuant to Article 17, Paragraph 1 of the Company Accounting Regulations of Japan, and any fractions falling short of one (1) yen as a result of such calculation shall be rounded up.

(2) The amount of capital reserve to be increased where shares are issued through the exercise of the stock options shall be the amount obtained by reducing the amount of

MR

stated capital to be increased calculated in accordance with Item (1) above from the maximum amount of the increase in the stated capital set forth in Item (1) above.

7. Restriction on Acquisition of Stock Options by Transfer

Acquiring the stock options by means of transfer shall require the approval of the board.

8. Terms and Conditions of Compulsory Redemption of the Stock Options

If any one of the following events occurs, on the date after such event separately set forth by the board of directors, the Company may compulsory acquire without consideration all or a part of the unexercised stock options owned by the stock option holder (in the case of Item (1), all stock option holders) by the time.

(1) Where the shareholders' meeting (the director(s) (the board of directors, where the approval of the shareholders' meeting is not required) of the Company approves a resolution of:

(i) A merger agreement in which the Company becomes the merged company;

(ii) A corporate demerger agreement or a corporate demerger plan in which the Company becomes a demerging company;

(iii) A share exchange (*kabushiki kokan*) agreement or a transfer shares (*kabushiki-iten*) plan in which the Company becomes a wholly-owned subsidiary;

(iv) Amendment of the articles of incorporation of the Company where terms and conditions of all of the class of shares underlying the stock options will be amended so that the Company has a right to compulsory redeem all of such shares upon a resolution of a shareholders' meeting;

(v) Demand for compulsory share purchase by a special controlling shareholder of the Company to the other shareholders (and the stock option holders).

(2) Where it becomes definite that a stock option holder can no longer satisfy the conditions for the exercise of the stock options (or, any of events where a stock option holder can no longer exercise stock options occurs (hereinafter the same)).

(3) Where a stock option holder passes away.

9. Policy about the Grant of Stock Options in the Event of Reorganization

If the Company intends to conduct absorption- or incorporation-type merger in which the Company becomes the merged company, absorption- or incorporation-type corporate demerger in which the Company becomes a demerging company, share exchange (*kabushiki kokan*) or share transfer (*kabushiki iten*) in which the Company becomes a wholly-owned subsidiary (all of the above collectively, "Reorganization"), on the

MR

Effective Date of the Reorganization ("Effective Date" means, the effective date of the absorption-type merger with regard to absorption-type merger, the incorporation date of the new company with regard to incorporation-type merger, the effective date of the absorption-type corporate demerger with regard to absorption-type corporate demerger, the incorporation date of the new company with regard to incorporation-type corporate demerger, the effective date of the share exchange with regard to share exchange, and the incorporation date of the wholly owning parent company with regard to share transfer (hereinafter the same)), the stock option shall cease to exist, and the Company shall, in each case, grant to the holders of the stock option remaining at the time immediately before the Effective Date (the "Remaining Stock Options"), new stock options in the applicable companies listed in Article 236, Paragraph 1, Item 8, sub-items (a) through (e) of the Companies Act of Japan (the "Reorganized Company"), subject to the following conditions. However, such grant of the new stock options shall occur only in the case where the relevant absorption- or incorporation-type merger agreement, absorption-type corporate demerger agreement, incorporation-type corporate demerger plan, share exchange agreement or share transfer plan, as the case may be, stipulates that stock options in the Reorganized Company shall be granted in line with the following conditions.

(1) Number of stock options in the Reorganized Company to be granted

Each holder of Remaining Stock Options will receive the same number of stock options in the Reorganized Company as the number of Remaining Stock Options held by such holder.

(2) Type of shares in the Reorganized Company subject to stock options

Common stock in the Reorganized Company.

(3) Number of shares in the Reorganized Company subject to stock options

To be determined according to Paragraph 2, by taking into account, among others, the terms and conditions of the Reorganization.

(4) Value of assets to be contributed upon the exercise of stock options

The value of assets to be contributed upon each exercise of stock options granted shall be the amount obtained by multiplying: (i) the amount of payment after Reorganization, which shall be obtained through the adjustment of the Exercise Price in accordance with Paragraph 3 after taking into account, among others, the terms and conditions of the Reorganization; by (ii) the number of shares in the Reorganized Company subject to such stock options, to be determined according to Item (3) above.

(5) Period during which stock options may be exercised

The period from the latter of: (i) the commencement date of the period during which stock options may be exercised as specified in Paragraph 5 or (ii) the Effective Date of the Reorganization, to the date of expiration of the period during which stock options may be exercised as specified in Paragraph 5 herein.

MR

(6) Rules on increase in capital stock and capital reserves in the event of issuance of shares upon the exercise of stock options

To be determined according to Paragraph 6.

(7) Restrictions on the acquisition of stock options by transfer

Any acquisition of stock options by means of transfer shall be subject to approval by a resolution of the board of directors (or the director(s) if the Reorganized Company has no Board of Directors) of the Reorganized Company.

(8) Conditions for the compulsory redemption of stock options

To be determined according to Paragraph 8.

(9) Conditions for the exercise of stock options

To be determined according to Paragraph 11.

10. Treatment of Fractions Falling Short of One Share as a Result of the Stock Option Exercise

Any fractions of a share in the number of shares to be delivered to the stock option holders who exercised the stock options shall be rounded down.

11. Terms and Conditions to Exercise the Stock Options

(1) The stock option holder, who had the status as director, officer or employee of the Company or its subsidiary (the "Status") when the stock options were issued to the stock option holder, may exercise the stock options only if the stock option holder has kept the Status from the issuance to the exercise, and satisfies other terms and conditions to exercise the stock options (and, any of events where the stock option holder can no longer exercise stock options has not occurred (hereinafter the same)); *provided, however*, the stock option holder may exercise, for one (1) year from the day on which the stock option holder loses the Status, the stock options which have become exercisable as of the day on which they lose the Status, as long as the stock option holder satisfies other terms and conditions to exercise the stock options. Even if one (1) year has elapsed since the day on which the stock option holder loses the Status, in the case where the Company gives approval for exercising the stock options to the stock option holders by a resolution of the board of directors, the stock option holder may exercise, until the end of the exercise period set forth in Paragraph 5, the stock options which have become exercisable as of the day on which they lose the Status.

(2) In the event of the stock option holder's death while the stock option holder maintains the Status, the inheritor of the stock option holder succeeds the stock option. The inheritor may exercise, for six (6) months after such death, the stock options which are exercisable as of the time of such death, provided that the inheritor keeps satisfying other terms and conditions to exercise the stock options. When

MR

there is no inheritor of the stock option holder, the stock options unexercised by the time of such death shall be treated as being waived.

(3) The stock option holder may not exercise the stock options once the stock option holder waive the options.

(4) Notwithstanding the other provisions in this Terms and Conditions, the stock option holders may not exercise the stock options in the case that they intentionally or by gross negligence breach internal regulations of the Company, or they cause damage to the Company by misconducts, leaks of trade secrets, or other forms of breaching their duty intentionally or by gross negligence. In addition to that, the stock option holders may not exercise the stock options while the Company is investigating on suspicion of the breaches set forth above.

(5) Notwithstanding the provisions from (1) to (4) above, where the Company gives approval of exercising the stock options to the stock option holders by the resolution of the board of directors, the stock option holders may exercise the stock option according to the resolution.

12. Amount to be Paid for the Issuance of Stock Options

No cash payment is required for the issuance of the stock options.

13. Allotment Date of the Stock Options

Date separately determined by the board of directors

14. Request for the exercise of and Payment for the Stock Options

(1) The stock option holder may exercise the stock options by filling out the "Request for the exercise of the stock option" as designated by the Company with the required information, placing either name and seal or signature of the stock option holder thereon, and submitting such form to the place stipulated in Paragraph 15.

(2) Along with the submission of the form set forth in Item (1), the stock option holder shall pay the full amount obtained by multiplying Exercise Price by the number of shares covered by each stock option, in cash, to the account stipulated in Paragraph 16 by the time designated by the Company.

15. Place for Handling Request for the Exercise of the Stock Options

The Company's General Affairs Division or other section which is in charge of the operations at the time.

16. Place for Handling Payment of Monies upon the Exercise of the Stock Options

Mizuho Bank, Ltd. or its successor at the time.

17. Treatment of the Replacement or Other Measures in Relation to this Terms and Conditions

MR

In the event that a provision of this Terms and Conditions is required to be replaced or otherwise, the Company may amend the provision in the way that the Company deems appropriate, pursuant to the substance of the provisions of Companies Act of Japan and the stock option. The amendment above shall constitute this Terms and Conditions.

18. Furthermore, any and all other necessary matters with regard to the stock options shall be determined by the Representative Director of the Company.

(*intentionally left blank*)

MR

# EXHIBIT B

## THE SUB-PLAN

MR

**ISPACE, INC. (THE "*COMPANY*")**
**U.S. SUB-PLAN TO THE TERMS AND CONDITIONS FOR STOCK OPTIONS**

The terms of this U.S. Sub-Plan to the Terms and Conditions for Stock Options of the 3rd Issue of Stock Option (the "Sub-Plan") apply to stock options granted under the Terms and Conditions for Stock Options of the 3rd Issue of Stock Options (the "Plan") to individuals who are U.S. residents or are subject to U.S. federal income tax (such stock options, "Stock Options"). This Sub-Plan is a part of the Plan. If there is a conflict, whether explicit or implied, between the provisions of the Plan and the Sub-Plan, the Sub-Plan shall prevail.

1. Shares Subject to the Sub-Plan.

(a) Maximum Number of Shares from the Plan Subject to Sub-Plan. Subject to Sub-Plan Section 7, not more than 27,500 shares of common stock of the Company ("***Shares***"), that are reserved under the Plan may be subject to Stock Options and granted under the Sub-Plan.

(b) Subject to adjustment as provided in the Plan, the maximum number of Shares issuable upon the exercise of incentive stock options within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***"), and the regulations promulgated thereunder (such stock options, "***ISOs***") will equal the aggregate Share number stated in Section 1(a).

2. Administration of the Sub-Plan. The Sub-Plan will be administered by the Company's board of directors (the "***Board***"). Subject to the provisions of the Sub-Plan, the Board will have the authority, in its discretion, to make all determinations deemed necessary or advisable for administering the Sub-Plan. The Board's decisions, determinations and interpretations will be final and binding on all holders of outstanding Stock Options ("***Option Holders***").

3. Eligibility. ISOs may be granted only to any person employed by the Company or any "parent corporation" as defined in Code Section 424(e) (a "***Parent***") or "subsidiary corporation" as defined in Code Section 424(f) (a "***Subsidiary***") of the Company (such person, an "***Employee***"). Stock Options that are not ISOs (nonstatutory stock options, or "***NSOs***") may be granted to any natural person engaged by the Company or a Parent or Subsidiary to render to such entity bona fide services that (i) are not in connection with the offer or sale of securities in a capital-raising transaction and (ii) do not directly promote or maintain a market for the Company's securities ("***Service Providers***"). Each Stock Option will be designated as either an ISO or an NSO in the agreement setting forth the terms of the Stock Option (the "***Option Agreement***").

4. Stock Options.

(a) Grant of Stock Options. The Board is authorized to grant Stock Options in accordance with the Plan, the Sub-Plan and Companies Act of Japan.

(b) Stock Option Agreement. Each Stock Option will be evidenced by a stock option agreement (a "***Stock Option Agreement***") that will specify the exercise price, the term of the Stock Option, the number of Shares subject to the Stock Option, the exercise restrictions, if any, applicable to the Stock Option, and such other terms and conditions as the Board, in its sole discretion, will determine.

(c) Limitations. Each Stock Option will be designated in the Stock Option Agreement as either an ISO or a NSO. Notwithstanding such designation, however, to the extent that the aggregate Fair Market Value on the date of grant of the Shares with respect to which ISOs are exercisable for the first time by the Option Holder during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds one hundred thousand dollars ($100,000), such Stock Options will be treated as NSOs. For purposes of this Section 4(c), ISOs will be taken into account in the order in which they were granted, the Fair Market Value of the Shares will be determined as of the time the Stock Option with respect to such Shares is granted,

and calculation will be performed in accordance with Code Section 422 and Treasury Regulations promulgated thereunder.

(d) Term of Stock Option. The term of each Stock Option will be 10 years from the grant date unless a shorter term is stated in the Stock Option Agreement, provided that any ISO granted to an Option Holder who, at the time of grant, owns stock representing more than 10% of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary (a "***10% Shareholder***") will have a term of 5 years from the grant date unless a shorter term is provided in the Stock Option Agreement.

(e) Stock Option Exercise Price and Consideration.

(i) Exercise Price. The per Share exercise price of a Stock Option will be determined by the Board in good faith, subject to the approval of the shareholders' meeting of the Company to the extent required by applicable law, but will be no less than the Fair Market Value on the grant date. In addition, in the case of an ISO granted to a 10% Shareholder, the per Share exercise price will be no less than 110% of the Fair Market Value on the grant date. Notwithstanding the foregoing provisions of this Section 4(e), Stock Options may be granted with a per Share exercise price of less than the Fair Market Value per Share on the grant date pursuant to a transaction described in, and in a manner consistent with, Code Section 424(a). For purposes of this Sub-Plan, "***Fair Market Value***" means, as of any date, the value of a Share, as determined by the Board in good faith, subject to the approval of the shareholders' meeting of the Company to the extent required by applicable law.

(ii) Form of Consideration. The Board will determine the acceptable form of consideration for exercising a Stock Option, including the method of payment. In the case of an ISO, the Board will determine the acceptable form of consideration at the time of grant. Such consideration may consist entirely of: (A) cash; (B) check; or (C) promissory note, to the extent permitted by applicable laws, (D) such other consideration and method of payment for the issuance of Shares to the extent permitted by applicable laws, or (E) any combination of the foregoing methods of payment. In making its determination as to the type of consideration to accept, the Board will consider if acceptance of such consideration may be reasonably expected to benefit the Company.

(f) Stock Option Exercise. A Stock Option may be exercised only in accordance with the terms and conditions for exercise set forth in an Option Holder's Stock Option Agreement (but in no event later than the expiration of the term of such Stock Option as set forth in the Stock Option Agreement).

5. Compliance With Code Section 409A. Stock Options will be designed and operated in such a manner that they are either exempt from the application of, or comply with, the requirements of Code Section 409A, except as otherwise determined in the sole discretion of the Board. The Sub-Plan and each Stock Option Agreement under the Sub-Plan is intended to meet the requirements of Code Section 409A and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Board. To the extent that a Stock Option or payment, or the settlement or deferral thereof, is subject to Code Section 409A, the Stock Option will be granted, paid, settled or deferred in a manner that will meet the requirements of Code Section 409A, such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Code Section 409A.

6. Limited Transferability of Stock Options.

(a) Unless the Stock Option Agreement provides otherwise, a Stock Option may not be sold, pledged, assigned, hypothecated, or otherwise transferred in any manner other than by will or by the laws of descent and distribution, and may be exercised, during the Option Holder's lifetime, only by the Option Holder. If the Stock Option Agreement permits transfer, such Stock Option may only be transferred (i) by will, (ii) by the laws of descent and distribution, or (iii) as permitted by Rule 701 of the U.S. Securities Act of 1933, as amended (the "***Securities Act***").

MR

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), or after the Board determines that it is, will, or may no longer be relying upon the exemption from registration under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "***Rule 12h-1(f) Exemption***"), a Stock Option, or prior to exercise, the Shares subject to the Stock Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of the Option Holder upon the death or disability of the Option Holder, in each case, to the extent required for continued reliance on the Rule 12h-1(f) Exemption. Notwithstanding the foregoing sentence, the Board, in its sole discretion, may determine to permit transfers to the Company or in connection with a change in control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f) or, if the Company is not relying on the Rule 12h-1(f) Exemption, to the extent permitted by the Sub-Plan.

7. Adjustments; Dissolution or Liquidation; Reorganization.

(a) Adjustments. In the event that any dividend or other distribution (whether in the form of cash, Shares, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Shares or other securities of the Company, or other change in the corporate structure of the Company affecting the Shares occurs, the Board shall adjust outstanding Stock Options pursuant to the terms of the Plan; provided, however, that the Board will make such adjustments to a Stock Option required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Stock Option.

(b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, the Board will notify each Option Holder as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised, a Stock Option will terminate immediately prior to the consummation of such proposed action.

(c) Corporate Reorganization. In the event of a Reorganization (as defined in the Plan), each outstanding Stock Option will be treated pursuant to the terms of the Plan.

8. Tax Withholding.

(a) Withholding Requirements. Prior to the delivery of any Shares or cash pursuant to a Stock Option (or exercise thereof), the Company will have the power and the right to deduct or withhold, or require an Option Holder to remit to the Company, an amount sufficient to satisfy federal, state, local, foreign or other taxes (including the Option Holder's FICA obligation) required to be withheld with respect to such Stock Option (or exercise thereof).

(b) Withholding Arrangements. The Board, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit an Option Holder to satisfy such tax withholding obligation, in whole or in part by such methods as the Board shall determine. The amount of the withholding requirement will be deemed to include any amount which the Board agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax rates applicable to the Option Holder with respect to the Stock Option on the date that the amount of tax to be withheld is to be determined. The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

MR

9. No Effect on Employment or Service. Neither the Sub-Plan nor any Stock Option will confer upon an Option Holder any right with respect to continuing the Option Holder's Status (as defined in the Plan) as a Service Provider, nor will they interfere in any way with the right of the Option Holder, the Company, or any Parent or Subsidiary, to terminate such relationship at any time, with or without cause, to the extent permitted by applicable laws.

10. Date of Grant. The date of grant of a Stock Option will be, for all purposes, the date on which the Board makes the determination granting such Stock Option, or such other later date as is determined by the Board. Notice of the determination will be provided to each Option Holder within a reasonable time after the date of such grant.

11. Term of Sub-Plan. Subject to Section 12, the Sub-Plan will become effective upon its adoption by the Board. Unless sooner terminated under Section 13, it will continue in effect for a term of 10 years from the Sub-Plan's effective date.

12. Shareholder Approval of Adoption of Sub-Plan. The Sub-Plan must be approved by Company shareholders, in the manner and to the degree required under applicable laws, within 12 months after Board approval of the Sub-Plan.

13. Amendment and Termination of the Sub-Plan. The Board may at any time amend, alter, suspend or terminate the Sub-Plan. The Company will obtain shareholder approval of any Sub-Plan amendment to the extent necessary and desirable to comply with applicable laws. No amendment, alteration, suspension or termination of the Sub-Plan will materially impair the rights of any Option Holder, unless the Option Holder and the Board otherwise agree in writing. Termination of the Sub-Plan will not affect the Board's ability to exercise the powers granted to it hereunder with respect to outstanding Stock Options.

14. Conditions Upon Issuance of Shares.

(a) Legal Compliance. Shares will not be issued pursuant to the exercise of a Stock Option unless the exercise of such Stock Option and the issuance and delivery of such Shares will comply with applicable laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

(b) Investment Representations. As a condition to the exercise of a Stock Option, the Company may require the person exercising such Stock Option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

15. Information to Option Holders. If and as required (i) pursuant to Rule 701 of the Securities Act, if the Company is relying on the exemption from registration provided pursuant to Rule 701 of the Securities Act with respect to the applicable Stock Option, and/or (ii) pursuant to Rule 12h-1(f) of the Exchange Act, to the extent the Company is relying on the Rule 12h-1(f) Exemption, then during the period of reliance on the applicable exemption and in each case of (i) and (ii) until such time as the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company shall provide to each Option Holder the information described in paragraphs (e)(3), (4), and (5) of Rule 701 under the Securities Act not less frequently than every six (6) months with the financial statements being not more than 180 days old and with such information provided either by physical or electronic delivery to the Option Holders or by written notice to the Option Holders of the availability of the information on an Internet site that may be password-protected and of any password needed to access the information. The Company may request that Option Holders agree to keep the information to be provided pursuant to this section confidential. If an Option Holder does not agree to keep the information to be provided pursuant to this section confidential, then the Company will not be required to provide the information unless otherwise required pursuant to Rule 12h-1(f)(1) under the Exchange Act (if the Company is relying on the Rule 12h-1(f)

MR

Exemption) or Rule 701 of the Securities Act (if the Company is relying on the exemption pursuant to Rule 701 of the Securities Act).

* * *

MR

# EXHIBIT C

## INVESTMENT REPRESENTATION STATEMENT

| | | |
|---|---|---|
| PARTICIPANT | : | Mohamed Ragab |
| COMPANY | : | ISPACE, INC. |
| SECURITY | : | COMMON STOCK |
| AMOUNT | : | 12,500 shares |
| DATE | : | 30 May, 2018 |

In connection with the purchase of the above-listed Securities, the undersigned Participant represents to the Company the following:

(a) Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Participant is acquiring these Securities for investment for Participant's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "***Securities Act***").

(b) Participant acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c) Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Participant, the exercise shall be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of Affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

MR

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an Affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d) Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Participant understands that no assurances can be given that any such other registration exemption shall be available in such event.

PARTICIPANT

Signature

Mohamed Ragab
Print Name

30 May, 2018
Date

## SCHEDULE 1

### PROVISIONS TO BE STIPULATED

(Prohibition of Transfer.)

Unless abiding by the process stipulated in this agreement, the Participant may not assign, pledge, mortgage or otherwise dispose of any of the shares or other equity securities (shares, stock options, bonds with stock options, or any other rights to acquire shares of the Company. hereinafter the same) that the Participant owns to any third party including other shareholder of the Company.

(Change of Control Transaction.)

In case issuance or transfer of shares or other equity securities, corporate reorganization or other transaction to which the Company is a party or where the Company is the target company that will result in a purchaser (and the purchaser's subsidiaries stipulated in the Ordinance on Terminology, Forms, and Preparation Methods of Financial Statements, etc. of Japan, the purchaser's related companies stipulated in the same ordinance, and family members of the purchaser) that shall own the majority of the voting rights of the Company, and if shareholders that own a majority of the outstanding shares of the common stock of the Company request so, the Participant shall sell all of the shares and other equity securities of the Company that the Participant owns or otherwise participate in such a transaction.

MR